2022 IL App (1st) 210156-U

SIXTH DIVISION
January 14, 2022

No. 1-21-0156

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| GERALD GLAZER, JULIUS CHERRY, and MARK SILVERBERG, Individually and Derivatively on Behalf of THE PRIVATE RESIDENCES AT ONTARIO PLACE CONDOMINIUM ASSOCIATION, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 20 CH 4878 |
| THE PRIVATE RESIDENCES AT ONTARIO PLACE CONDOMINIUM ASSOCIATION, an Illinois Not-For-Profit Corporation, and Its Board of Managers, ELLEN GUTIONTOV, JASON BISCHOFF, MICHAEL LANE, SAMANTHA LANE, and MALEK ABDULSAMAD, Individually and Collectively, | ) ) ) ) ) ) ) | The Honorable Neil H. Cohen, Judge Presiding. |
| Defendants-Appellees. | ) | |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court properly dismissed condominium unit owners' complaint against their condominium association and the association's board of managers. Defendants had no duty under the Condominium Property Act to obtain unit owners' approval prior to investigating or negotiating a bulk sale of the property and unit owners did not state a claim for breach of fiduciary duty based on an alleged failure to disclose requested documents.

¶ 2    The plaintiffs in this case are condominium unit owners who sued their condo association and board of managers, alleging that the association and board were required to disclose information to them and obtain their approval before investigating and negotiating a proposed bulk sale of condo units and that, in failing to do so, had violated sections 15 and 19 of the Condominium Property Act (Act) (765 ILCS 605/15, 19 (West 2020)) and breached the common law fiduciary duties of disclosure, candor, and loyalty owed to unit owners. The circuit court granted defendants' motion to dismiss, and plaintiffs have appealed. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    This action stems from the attempted, but ultimately unsuccessful, bulk sale of the condominium property located at 10 East Ontario Street in Chicago, Illinois, also known as the Private Residences at Ontario Place, a Condominium (Ontario Place), to Strategic Properties of North America (SPNA). Ontario Place is comprised of 467 residential units, 3 commercial units, and approximately 521 parking units. There is a condominium association (the Association) to which all unit owners belong. Plaintiffs—Gerald Glazer, Julius Cherry, and Mark Silverberg— each own at least one unit at Ontario Place and are thus members of the Association.

¶ 5    On July 9, 2020, plaintiffs filed their initial verified complaint for declaratory and other relief against the Association and its board of managers (the Board)—Ellen Gutiontov, Jason Bischoff, Michael Lane, Samantha Lane, and Malek Abdulsamad—(collectively, defendants). In it, plaintiffs alleged that defendants had received a letter of intent from SPNA dated February 26, 2020, "for the purchase of approximately 467 Units along with the common elements of the [Association] as part of the bulk sale of the [Association] property pursuant to section 15 of the Illinois Condominium Act and the Chicago Condominium ordinance."

¶ 6    In count I, plaintiffs sought several declarations, including ones stating that (1) pursuant to section 18.4 of the Act (765 ILCS 605/18.4 (West 2020)), the power and authority to pursue a bulk sale of the condominium units is reserved to the unit owners and not to the Board; (2) pursuant to article III, section 7 of the Association bylaws and section 18(b)(13) of the Act (765 ILCS 605/18(b)(13) (West 2020), the Board and Association are not permitted to pursue a bulk sale of the condominium units without an affirmative vote of 2/3 of the unit owners; and (3) the Board's "fiduciary obligation of disclosure, candor and loyalty" owed to the unit owners in connection with a bulk sale of the condominium units is not limited to sharing the information delineated in section 19 of the Act "but extends to all information in the possession or control of the [Board]" that a unit owner "may reasonably find useful to provide guidance or insight in considering a prospective bulk sale of units."

¶ 7    In count II, for breach of fiduciary duty, plaintiffs asked that defendants be restrained and enjoined from pursuing a bulk sale of Ontario Place without complying with the requirements of article III, section 7 of the bylaws and section 18(b)(13) of the Act and from ever pursuing a bulk sale with SPNA or any affiliate of SPNA. They asked the circuit court to enter judgment against the Board and its members, individually and collectively, for $25,575 in fees and costs "wrongfully expended or incurred" by the Association in pursuit of the bulk sale of Ontario Place to SPNA. Finally, in count III, plaintiffs asked for an accounting "of all funds expended in furtherance of the unauthorized transaction with SPNA."

¶ 8    On August 4, 2020, plaintiffs filed a motion for a temporary restraining order (TRO) and preliminary injunction, explaining that the Board had sent a voting package related to the proposed sale of Ontario Place to the unit owners on July 30, 2020, and asked the circuit court to intervene in "the improper and unauthorized voting" that was set to commence on August 4, 2020, and

continue until August 18, 2020. Plaintiffs asked the court to enter an order restraining and enjoining defendants, until further order of the court, from pursuing a bulk sale to SPNA or any other potential purchaser.

¶ 9 On August 7, 2020, the circuit court denied the motion for injunctive relief, finding that the Board was "not required to obtain the authority of the unit owners" before engaging in preliminary negotiations for a bulk sale of Ontario Place or before submitting the terms of a purchase and sale agreement for the bulk sale to the unit owners by either article III, section 7 of the Association bylaws or by section 18(b)(13)(iii) of the Act.

¶ 10 We affirmed the circuit court's denial of the TRO on interlocutory appeal. In doing so, we noted that the only thing that could be enjoined was a vote on the actual offer, which the parties agreed was required under the Act before the bulk sale could be completed. *Glazer v. The Private Residences at Ontario Place Condominium Association*, No. 1-20-0861 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)). We agreed with the circuit court that plaintiffs had failed to show a likelihood of success on the merits and were thus not entitled to the relief they sought. *Id.*

¶ 11 On August 18, 2020, the unit owners voted on the proposed bulk sale of Ontario Place to SPNA. The votes of the unit owners in favor of the sale were insufficient to approve the sale. The votes were 74.04% in favor and 22.42% against. A vote of 85% in favor was required to approve the bulk sale under Chicago's municipal code. Chicago Municipal Code § 13-72-085 (added Sept. 18, 2019).

¶ 12 Plaintiffs filed their first amended complaint on September 8, 2020. In it, they acknowledged that the Board had held the vote of the unit owners and that the bulk sale had not been approved. Plaintiffs realleged their counts for declaratory relief (count I) and breach of

fiduciary duty (count II), clarifying that these counts were alleged by plaintiffs individually. The amended complaint added count III, a claim of breach of fiduciary duty brought "derivatively on behalf of the Condominium Association." In count IV, plaintiffs sought an accounting, both individually and derivatively.

¶ 13    By agreed order entered on September 23, 2020, plaintiffs were permitted to file a second amended complaint *instanter* to add an allegation that the Board failed to provide plaintiffs with an appraisal pursuant to section 15 of the Act.

¶ 14    Defendants moved to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)). They argued both that plaintiffs had failed to state a claim (see 735 ILCS 5/2-615 (West 2020)) because their claim for declaratory relief was moot, improper, and based on an erroneous interpretation of the Act, defendants had no duty to disclose an appraisal or letter of intent, and dismissal was required under the business judgment rule. Defendants also argued that plaintiffs' complaint suffered from an affirmative defect because plaintiffs had received all the information required by the Act (see 735 ILCS 5/2-619(a)(9) (West 2020)).

¶ 15    On January 15, 2021, the circuit court granted defendants' motion to dismiss the second amended complaint with prejudice. The court found that plaintiffs were not entitled to a declaration about the Board's past conduct or hypothetical future actions, plaintiffs were not entitled to a declaration that defendants violated the Association bylaws or the Act as a matter of law, the Board had no fiduciary obligation to provide plaintiffs with information about the investigation or negotiation of the sale, plaintiffs failed to allege any breach of a fiduciary duty by the Board, and plaintiffs were not entitled to an accounting where no breach of fiduciary duty was properly alleged.

¶ 16    This appeal follows.

¶ 17                            II. JURISDICTION

¶ 18    Plaintiffs timely filed their notice of appeal from the court's dismissal of their complaint on February 16, 2021. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 19                            III. ANALYSIS

¶ 20    On appeal, plaintiffs argue that the circuit court erred in dismissing their complaint because (1) the Board was required by the Act to obtain approval of the unit owners before initiating or engaging in acts in anticipation of a bulk sale of the property, (2) the Board violated the Act and its common law fiduciary duty by failing to provide plaintiffs with the letter of intent and the appraisal, (3) plaintiffs were entitled to declaratory relief, and (4) if any of these claims were incorrectly dismissed, plaintiffs and the Association have claims for breach of fiduciary duty and an accounting. We review the grant of a motion to dismiss *de novo*. *Zander v. Carlson*, 2020 IL 125691, ¶ 18.

¶ 21              A. The Act Does Not Require the Board to Obtain Approval of

                   Unit Owners Prior to Negotiating a Bulk Sale

¶ 22    The primary argument that plaintiffs make on appeal is that the Board was required to get approval from the unit owners prior to negotiating the terms of any bulk sale of Ontario Place. The premise of this argument is that the Act does not give the Board authority "to unilaterally perform acts in preparation for and in anticipation of" a bulk sale of the property. Rather, plaintiffs argue, the Board is first required to obtain approval for such negotiations from at least 2/3 of the unit owners. Thus, according to plaintiffs, the Board violated the Act by investigating and negotiating

a bulk sale with SPNA without first obtaining unit owner approval.

¶ 23    It is true, as plaintiffs point out, that "[c]ondominiums are creatures of statute and, thus, any action taken on behalf of the condominium must be authorized by statute." *Alliance Property Management, Ltd. v. Forest Villa of Countryside Condominium Ass'n*, 2015 IL App (1st) 150169, ¶ 27. "The affairs of condominium associations are controlled by the Condominium Property Act." *Id.* A condominium is created when a declaration—"the instrument by which the property is submitted to the provisions of [the] Act"—is recorded. 765 ILCS 605/3, 4 (West 2020); *Alliance*, 2015 IL App (1st) 150169, ¶ 27. The administration of a condominium is governed by its declaration, board rules and regulations, and bylaws. *Id.* The Act delineates the general content of the declaration and bylaws. *Id.* In determining the scope of a condominium board's authority, the Act, declaration, and bylaws must be construed as a whole. *Id.*

¶ 24    Although in the circuit court plaintiffs relied not only on the Act but on the Association's bylaws and declaration as well, on appeal, they focus on the provisions of the Act. For this reason, and because Ontario Place's bylaws and condo declaration echo the relevant provisions of the Act, we confine our analysis to the text of the Act.

¶ 25    When construing a statute, the court's primary goal is to "ascertain and give effect to the intent of the legislature." *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 24. The best indication of legislative intent is the plain and ordinary meaning of the statutory language. *Id.* "It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent." *Id.* The statute should be read as a whole, and "each word, clause and sentence of a statute must be given a reasonable construction, if possible, and should not be rendered superfluous." *Id.*

¶ 26    The premise of plaintiffs' statutory argument is that "any action taken by a board" must be specifically authorized by the Act or it is beyond the board's authority. However, the Act itself makes clear that the board's powers are broader than this. The relevant sections of the Act provide as follows. The "unit owners' association is responsible for the overall administration of the property through its duly elected board of managers" and "shall have and exercise all powers necessary or convenient to effect any or all of the purposes for which the association is organized, and to do every other act not inconsistent with law which may be appropriate to promote and attain the purposes set forth in this Act or in the condominium instruments." 765 ILCS 605/18.3 (West 2020). The Act provides that the board of managers "shall exercise for the association all powers, duties and authority vested in the association by law or the condominium instruments *except for such powers, duty and authority reserved by law to the members of the association*." (Emphasis added.) *Id.* §§ 18.3, 18.4.

¶ 27    Reading sections 18.3 and 18.4 together, it is clear the association administers the property *through* the board, and the Act gives the board all powers necessary to fulfill that role, excepting those powers exclusively reserved for the unit owners. See also *id.* § 2(*o*) (defining "Unit Owners' Association" as "the association of all the unit owners, acting pursuant to bylaws through its duly elected board of managers"). This is also reflected in section 18.4 of the Act, which, in providing a list of the powers and duties reserved to the board of managers, notes that the "powers and duties of the board of managers shall include *but shall not be limited to*" (emphasis added) those on the list, making the list nonexclusive. *Id.*; see also *Board of Managers of Village Square I Condominium Ass'n v. Amalgamated Trust & Savings Bank*, 144 Ill. App. 3d 522, 528 (1986) ("The plain language of section 18.4(*l*) reflects one power of a nonexclusive list of powers and duties granted to the board of managers of a condominium association.").

¶ 28 So, while plaintiffs are correct that section 18.4 does not *expressly* grant the Board any right to investigate and negotiate a bulk sale, no such express authorization is required. Section 18.4 gives the Board the power to do what is necessary for the Association as long as that power is not given expressly to the unit owners. Thus, absent some reservation of right to the unit owners or limitation on the Board's powers, the Act must be read to give the Board the authority to investigate and negotiate a bulk sale.

¶ 29 Plaintiffs argue that such a limitation exists in sections 15 and 18(b)(13)(iii) of the Act. Plaintiffs contend that these sections, read together, grant the power to approve any initiation of negotiations to the unit owners and thus limit the Board's authority to negotiate a bulk sale without unit owners' approval. We disagree that these sections, read separately or together, contain any such limitation.

¶ 30 Section 15 exclusively reserves to unit owners only the final decision on whether to sell the condominium property in a bulk sale. That section provides:

"Unless a greater percentage is provided for in the declaration or bylaws, *** a majority of the unit owners where the property contains 2 units, or not less than 66 2/3% where the property contains three units, and not less than 75% where the property contains 4 or more units may, by affirmative vote at a meeting of unit owners duly called for such purpose, elect to sell the property." *Id.* § 15.[1]

"Property" is defined by the Act in a way that clearly encompasses what was being sold in the bulk sale at issue here. The definition in the Act is:

"all the land, property and space comprising the parcel, all improvements and structures

---

[1] As noted above, because this bulk sale was being proposed for a Chicago property, instead of the 75% vote of approval required by the Act, the sale would have only gone forward with an 85% vote of approval as required by section 13-72-085 of the Chicago Municipal Code (added Sept. 18, 2019)

erected, constructed or contained therein or thereon, including the building and all easements, rights and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the unit owners, submitted to the provisions of this Act." *Id.* § 2(c).

¶ 31 Section 18, by its title, governs the contents of the association bylaws. One of the items that section 18 dictates the bylaws "shall provide for" is "that matters subject to the affirmative vote of not less than 2/3 of the votes of unit owners at a meeting duly called for that purpose, shall include, but not be limited to" "the purchase or sale of land or units on behalf of all unit owners." *Id.* § 18(b)(13)(iii).

¶ 32 According to plaintiffs, sections 15 and 18(b)(13)(iii) "serve two distinct purposes in the bulk sale process." They argue that pursuant to section 18(b)(13)(iii), an affirmative vote of 2/3 of the unit owners is required to permit the Board to begin *any* process of exploring the possibility of a bulk sale. Section 15 then gives the unit owners the authority to approve the final terms of a bulk sale presented by the Board. But the plain language of sections 15 and 18(b)(13)(iii) makes clear that these provisions address two different, but related, issues and that neither of them requires an affirmative vote of unit owners before the board begins the process of negotiating a bulk sale.

¶ 33 While section 15 explicitly deals with the percentage of unit owners whose affirmative vote is required to approve a bulk sale of the "property"—or the condominium property as a whole— section 18(b)(13)(iii) speaks instead of "the purchase or sale of land or units," a phrase that encompasses sales of land or units that are much smaller than a bulk sale. Section 18(b)(13)(iii) dictates that the bylaws must include the requirement that at least 2/3 of unit owners must approve *any purchase or sale* of land or units on behalf of the association. Section 18(b)(13)(iii) clearly contemplates situations where the unit owners vote on the purchase or sale of any land or unit on

behalf of the association. Also, like section 15, section 18(b)(13(iii) says nothing about unit owners' approval prior to negotiations.

¶ 34    Plaintiffs argue that section 18(b)(13)(iii) "requires a 2/3rds vote by the association to perform other acts related to the property." But nothing in section 18(b)(13)(iii) refers to "other acts" or the "property" as defined in the Act as including "all the land" and its various parts. Rather, section 18(b)(13)(iii) refers to the "purchase or sale" of "land or units." The plain language of these two harmonious provisions simply does not support plaintiffs' argument.

¶ 35    Our refusal to read into the statute the requirement that plaintiffs seek here is further supported by the fact that our legislature considered and rejected the very limitation that plaintiffs ask us to find. On February 14, 2020, Illinois State Senator Sara Feigenholtz introduced Senate Bill No. 3731, proposing to add to section 18.4 of the Act the duty of a condo board:

> "(u) To refrain from investigating an offer to purchase a condominium property or listing the property for sale without first receiving authorization from the association through an affirmative vote of not less than 75% of unit owners based on the percentage of ownership." 101st Ill. Gen. Assem., Senate Bill 3731, 2020 Sess.

The bill was not passed into law.

¶ 36    Defendants rely on this proposed amendment as evidence that this requirement—that a board must obtain its unit owners' approval before any investigation or negotiation of a possible bulk sale may take place—does not currently exist in the Act. In support, defendants cite to our supreme court's decision in *Creel v. Industrial Commission*, 54 Ill. 2d 580, 584 (1973), for the proposition that "it is proper for [the reviewing court] to consider the subsequent amendment to a statute in determining the intent and meaning of the statute prior to the amendment." Plaintiffs, in turn, suggest that the fact that the bill was not passed is "evidence that it was not necessary because

the absence of the powers of the Board claimed by Plaintiffs was already sufficiently clear from existing statutes and the common law fiduciary duty of loyalty to a principal from his agent."

¶ 37 We note that because the plain language of the statute *is* clear, we need not consult such subsequent legislation. We nonetheless agree with defendants that, if anything, the proposed amendment supports their position that the Act presently does not require the Board to obtain the prior approval of unit owners before investigating a bulk sale. "An amendment of an unambiguous statute indicates a purpose to change the law." *Chiczewski By and Through Chiczewski v. Emergency Telephone System Board of DuPage County*, 295 Ill. App. 3d 605, 608 (1997). If any information can be gleaned from the proposed amendment, it is that the legislature was considering a change to the Act in the form of an additional limitation on the powers of condominium boards, and that it decided not to implement that change.

¶ 38 Plaintiffs make several additional arguments, none of which we find persuasive. Citing *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037 (2010), plaintiffs argue that because the Act is in derogation of common law, we must strictly construe it in their favor. Although it is true that statutes in derogation of common law are strictly construed in order to preserve rights and remedies that existed prior to their enactment (*id.* at 1043), *Gallagher* was not referencing condominium law or the Act. Rather, it rested on a strict construction of the Snow and Ice Removal Act (745 ILCS 75/1 *et seq.* (West 2008)). *Id.* at 1043-44. Plaintiffs have not cited, and our research has not revealed, a case that finds the Act to be in derogation of common law. Defendants argue vigorously that it is not. We need not decide this issue, however, because our determination that the plain language of the Act is clear and unambiguous renders considerations of strict versus liberal construction unnecessary.

¶ 39 Plaintiffs argue that as a matter of policy a board should not be allowed to unilaterally

decide to spend money on attorney fees and costs associated with the solicitation of offers which could result in "egregious violations of the Board's fiduciary duty in derogation of the unit owners' property rights." Of course, we are not free to ignore statutory language for policy reasons. *In re Estate of Snodgrass*, 336 Ill. App. 3d 619, 624 (2003); see also *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 193 (2016) ("policy arguments cannot supersede the clear statutory text"). In any event, the Act addresses concerns about board expenditures through the power of unit owners to select the board. The Act provides, for example, that "the terms of at least one-third of the members of the board shall expire annually;" that "no member of the board or officer shall be elected for a term of more than 2 years" (though "board members may succeed themselves"), and that the board is required to hold at least four board meetings per year, and unit owners are welcome to attend those meetings. *Id.* § 18(a)(1), (a)(9)(A), (a)(10), (a)(11). These protections are in the Act to ensure that the unit owners retain ultimate control over the Board and that the Board remains aware of unit owners' concerns.

¶ 40    In conclusion, nothing in the Act required the Board to obtain the approval of the unit owners before taking action to investigate or negotiate a bulk sale.

¶ 41        B. Plaintiffs Failed to State a Claim Based on a Failure to Disclose

¶ 42    Plaintiffs next argue that they sufficiently alleged that the Board violated either the Act or its "common law duty of loyalty to the unit owners" by not disclosing certain information that plaintiffs allege was material to their decision to approve or reject the proposed bulk sale, including the letter of intent from SPNA and an appraisal of Ontario Place. Plaintiffs alleged in their complaint that, pursuant to section 19 of the Act, they requested both documents, but the Board had refused to provide them.

¶ 43    Section 19 of the Act includes very explicit record retention and disclosure requirements.

It provides that the "board of managers of every association shall keep and maintain the following records" at the association's office:

> "(1) the association's declaration, bylaws, and plats of survey, and all amendments of these;
>
> (2) the rules and regulations of the association, if any;
>
> (3) if the association is incorporated as a corporation, the articles of incorporation of the association and all amendments to the articles of incorporation;
>
> (4) minutes of all meetings of the association and its board of managers for the immediately preceding 7 years;
>
> (5) all current policies of insurance of the association;
>
> (6) all contracts, leases, and other agreements then in effect to which the association is a party or under which the association or the unit owners have obligations or liabilities;
>
> (7) a current listing of the names, addresses, email addresses, telephone numbers, and weighted vote of all members entitled to vote;
>
> (8) ballots and proxies related to ballots for all matters voted on by the members of the association during the immediately preceding 12 months, including, but not limited to, the election of members of the board of managers; and
>
> (9) the books and records for the association's current and 10 immediately preceding fiscal years, including, but not limited to, itemized and detailed records of all receipts, expenditures, and accounts." 765 ILCS 605/19 (West 2020).

¶ 44    The disclosure obligations under the Act mirror these retention requirements. The Act provides that "[a]ny member of an association shall have the right to inspect, examine, and make copies of the records described in" subdivisions (1)-(6) and (9) of subsection (a). *Id.* § 19(b).

¶ 45    Plaintiffs do not suggest that either the letter of intent or the appraisal they sought falls into any of the section 19 categories. They instead argue that section 19 is a "nonexclusive" list of documents. But the language of the section does not support this interpretation. The Act states that a board is required to keep "the following records." This list is not qualified, as other lists are within the Act, with a phrase such as "including, but not limited to." This is in contrast to the language of section 18.4, for example, which states that the duties of the board "shall include *but shall not be limited to*." (Emphasis added.) *Id.* § 18.4. There is simply no support for plaintiffs' claim that defendants had a duty to provide these documents to unit owners under the Act.

¶ 46    We agree with plaintiffs that, in addition to their duties under the Act, the Board has a common law fiduciary duty to unit owners (765 ILCS 605/18.4 (West 2020)) that could include some duty to share information. Plaintiffs argue that "with or without Section 19, the common law duty of candor means that a board must treat unit owners with the highest degree of honesty and good faith and that they have an obligation of full, fair complete and timely disclosure of material facts." However, plaintiffs have also failed to state a claim for breach of fiduciary duty based on the failure to disclose these documents.

¶ 47    To state a cause of action for a breach of fiduciary duty, a plaintiff must allege (1) a fiduciary duty on the part of the defendant; (2) a breach of that duty; (3) damages; and (4) a proximate cause between the breach and the damages. *Feliciano v. Geneva Terrace Estates Homeowners Ass'n*, 2014 IL App (1st) 130269, ¶ 35.

¶ 48    In this case, plaintiffs claim that the Board had a fiduciary duty to disclose the appraisal and the letter of intent, even if those documents were not listed in the Act, because they were "material." The second amended complaint acknowledges that, prior to the August 18, 2020, vote on the bulk sale, the appraisal was made available to the unit owners through an online portal and

one of the named plaintiffs located it there. Thus, there could be no breach of any duty to disclose the appraisal.

¶ 49    This leaves the letter of intent, and plaintiffs offer no argument as to why that document was "material" to the unit owners or what damages plaintiffs suffered from its nondisclosure. Plaintiffs allege in the most general of terms that they were "damaged by the loss and/or diminution of rights they hold as Unit Owners." Plaintiffs fail to allege any connection between the nondisclosure of documents and this alleged injury.

¶ 50    Plaintiffs' claim is that the Board improperly negotiated a proposed bulk sale. As we have already found, the unit owners' role was limited to voting on whether to approve this sale. They exercised this right, and the votes of the unit owners gave the Board insufficient support to go forward with the proposed bulk sale. Thus, even if we assume the letter of intent was material to this vote and should have been disclosed, the sale that plaintiffs opposed was not approved. It is clear from the face of plaintiffs' complaint that they suffered no injury from any alleged breach of the Board's fiduciary duty to disclose documents.

¶ 51                    C. Plaintiffs' Other Arguments Lack Merit

¶ 52    The remainder of plaintiffs' arguments depend on our acceptance of their contention that the Board violated the Act or breached its fiduciary duty, arguments we have already rejected. Absent some violation of the Act or breach of fiduciary duty, plaintiffs can have no right to declaratory relief, and they acknowledge that their other claims for breach of fiduciary duty are dependent "on whether the Board had a duty under the Act, bylaws and common law" to disclose any material information relating to the bulk sale or to get approval from the unit owners before taking any steps in anticipation of a bulk sale.

¶ 53    In addition, to the extent that plaintiffs seek a declaration that the Board's fiduciary duty

of disclosure to unit owners goes beyond what is required by the Act or the bylaws to include "all information in the possession or control of the Board of Managers which a Unit Owner may reasonably find useful to provide guidance or insight in considering a prospective bulk sale of units," this claim fails as a matter of law under the declaratory judgment statute. Not only has the actual controversy on which this disclosure was based ended—as the bulk sale was voted down by the unit owners on August 18, 2020—but in our view this declaration is the sort of abstract, hypothetical request to render legal advice on future events that the declaratory judgment statute is not meant to encompass. See *Byer Clinic & Chiropractic, Ltd. v. State Farm Fire & Cas. Co.*, 2013 IL App (1st) 113038, ¶ 17.

¶ 54    Our rejection of plaintiffs' arguments that the Board violated the Act and breached its fiduciary duty make it unnecessary for us to address the other issues raised by plaintiffs on appeal—whether they can properly sue individually and/or derivatively on behalf of the Association and whether they are entitled to an accounting as part of their remedy. As plaintiffs have failed to state a claim, our resolution of these issues would be purely academic.

¶ 55                                IV. CONCLUSION

¶ 56    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 57    Affirmed.